STATE of South Dakota, Plaintiff
and Appellee,

v.

Howard Joseph ADAMS, Defendant
and Appellant.

No. 15676.

Supreme Court of South Dakota.

Argued Nov. 18, 1987.

Decided Jan. 20, 1988.

Robert E. Mayer, Asst. Atty. Gen., Roger A. Tellinghuisen, Atty. Gen., on brief, Pierre, for plaintiff and appellee.

Steve Miller, Jana M. Miner, on brief, Sioux Falls, for defendant and appellant.

SABERS, Justice.

Howard Joseph Adams (Adams) appeals from murder, robbery, and aggravated kidnapping convictions. We affirm.

*Facts*

At approximately noon on June 18th, 1986, Adams and Jimmy Lee Boykin (Boykin) visited Marlene Anawski (Anawski) whom they recently met. Adams and Boykin planned to go swimming on the afternoon of the 18th, but problems with the fuel pump on their car left them stranded in Sioux Falls. Contradictory testimony places the abandoned two-tone, early seventies Plymouth in either an alley near McKennan Hospital or the Prairie Market parking lot. Because they were without transportation, Anawski offered Adams and Boykin a place to stay for the evening. Sleeping quarters were set up for Adams and Boykin in a see-through mesh tent in the backyard. A party began at the Anawski residence in the early evening and broke up at approximately 12:45 a.m. Adams took a shower, and exchanged the cut-off jeans he had been wearing for a pair of jeans and a light nylon lavender and white shirt which he borrowed. Adams and Boykin attempted to hitch a ride to the nearby Stockmen's Bar but had to walk. They arrived at the Stockmen's Bar soon after leaving the Anawski residence. Adams left the bar a little before 2:00 a.m. but remained outside the building. At approximately 3:00 to 3:05 a.m., Adams and Boykin left the area of Stockmen's Bar and proceeded toward the Prairie Market parking lot.

In the early morning hours of June 19th, DuWayne Jensen (Jensen) picked up newspapers at the Argus Leader dock for delivery along his scheduled route. He departed from the pickup point at approximately 3:00 a.m. He made his first newspaper drop at Don's Diner and continued to his next scheduled drop at the Prairie Market. Later that morning, the Argus Leader began receiving complaints that newspapers had not been received on the east route. Jensen's route was retraced. At the newspaper rack at Prairie Market, papers from the previous day were lying on top of the rack, and current papers were inside the rack but scattered all over. Jensen did not make a delivery to his next stop at the Morrell plant.

Jensen's body was found around noon on June 19th in a field not far from Morrell's. His jaw and windpipe had been fractured and he had two black eyes. The cause of death was multiple stab wounds. Jensen's small white pickup was not at the scene, but had been seen at Morrell's earlier. Morrell worker Joe Kussela testified that as he came to work at approximately 3:30 in the morning, he pulled into the parking lot east of the plant and his headlights picked out a small white pickup parked near a truck owned by a friend. He noticed a man with dark brown hair, a beer belly, cut-off shorts, and no shoes. This man was dropping something into the bed of a pickup owned by a friend of Kussela. The man returned to the white truck and drove away. Kussela saw that there was a passenger in the truck. When Kussela's friend looked into the back of his truck later he discovered a bundle of newspapers. The papers were returned to the Argus and then given to another delivery man to finish Jensen's route. One paper was brought back when the second delivery driver noticed a dark stain on it. This stain was later identified as blood.

Testimony at trial showed that Adams returned to the Anawski residence sometime during the middle of the night and redressed in his cut-off shorts. The jeans and lavender shirt he was wearing that evening disappeared. Testimony also showed that by 5:00 a.m. on June 19th, Adams was asleep in the mesh tent in the Anawski backyard. He was wearing cut-off shorts.

Adams was arrested on June 20th, 1986 in Mitchell, South Dakota on unrelated

charges. It was discovered that Adams had recent deep cuts on his left ring finger and left index finger. He and Boykin were indicted on charges of first-degree murder, felony murder, first-degree robbery, and aggravated kidnapping on July 21, 1986. As part of his defense, Adams claimed that it was Boykin, not Adams, who killed Jensen. Adams was tried before a jury on November 4th through December 17th, 1986. He was convicted of first-degree murder, first-degree robbery, and aggravated kidnapping.

### 1. BLOODSTAIN TESTING TESTIMONY BY STATE WITNESS REX RIIS

Adams contends that the trial court erred in allowing Rex Riis of the Division of Criminal Investigation (D.C.I.) crime laboratory to testify about the results of tests Riis ran on bloodstains found on newspapers and the victim's handkerchief and pickup. Riis' conclusions were that certain bloodstains on Jensen's handkerchief could have come from Adams, but not from Jensen or Boykin. As he did at the motion hearing, Adams argues that the scientific testing methodology and the specific techniques employed by Riis were not sufficiently reliable to warrant admission of the test results.

### A. Standards for Admission

Initially, we clarify the standards for determining whether scientific testimony will be admitted. For many years, this court and the courts of many other jurisdictions have been guided by the test enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923).[1] Under this test, before testimony related to a scientific principle or discovery is admissible, the principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014. The necessity for such a determination is obvious. It would be impractical to place upon the trial court the sole responsibility for determining whether a scientific principle is valid. While experienced judges are perhaps better positioned than most laypersons to evaluate complex scientific data, they have not been trained to evaluate scientific principles.

The *Frye* test does not simply elevate the opinion of the scientist over the layperson in determining the validity of scientific principles. It requires a general acceptance of the principle by those who are best equipped to evaluate—the experts in the particular scientific field. Not every scientist in a given field need embrace the principle, but a significant percentage must do so. Dismissed by some as a rather repugnant form of majoritarian head-counting, *Harper v. State*, 249 Ga. 519, 292 S.E.2d 389 (1982), we perceive the *Frye* test as requiring reasonable and necessary verification.[2] Therefore, we continue to adhere to the *Frye* test as controlling the issue of admissibility of evidence involving scientific principles.

### B. Electrophoretic Testing

Electrophoretic blood testing is utilized in several scientific fields, but has been employed most extensively in the area of criminal forensics. The identification of specific blood characteristics in bloodstains which are part of a criminal investigation is

---

**1.** Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.
*Id.* at 1014.

**2.** " 'It is exactly such scientific techniques which are likely to be overvalued as to accuracy in the minds of the jury and should not be admitted when merely supported by the opinion of a single minimally qualified expert. Accordingly, it is suggested that the Frye test ... remains appropriate.... Because new developments affect given knowledge about a particular subject matter, the proper scope of expert testimony under Rule 702 sometimes shifts with the times.' " J. Larson, *South Dakota Evidence: Decisions on the Rules*, p. 68 (1987) (*quoting* Graham, "Evidence, Text Rules, Illustrations and Problems," p. 308).

commonly the key to the prosecution's attempt to tie a particular defendant to a particular crime.

Electrophoresis is the movement of charged particles through a buffered conducting medium by application of a direct current. The term isozyme is used to describe enzymically active blood proteins which can be identified by their relative mobilities in an electric field. After separation of the proteins into marker bands by application of a current, specific chemicals are applied to make the proteins visible. [Citations omitted] The relative distance of the bands from a common origin is compared with known standards, and evaluated by established guidelines.

The results are then compared to population studies which show the known frequency of each factor in a given population. This produces a statistic which is representative of the percentage of the population that has that group and those factors in common. [Footnote omitted] The more genetic markers identified, the smaller the population of persons who might possess a particular combination of factors.

*People v. Young, (Young III )*, 425 Mich. 470, 515–16, 391 N.W.2d 270, 290–91 (1986) (Boyle, J. dissenting).

In *State v. Dirk*, 364 N.W.2d 117 (S.D. 1985), we found electrophoretic testing to be sufficiently reliable to pass the *Frye* test. Although the *Dirk* decision appears to control, the question of the reliability of electrophoretic blood testing continues to be challenged.[3] The 1986 *Young* decision demonstrates several difficulties in applying the *Frye* test to electrophoretic testing.

■ As noted above, electrophoresis is most commonly used in criminal forensics. As the *Young* court noted: "The number of scientists not working for a police agency who are familiar with electrophoresis of evidentiary bloodstains is small." *Young,*

*supra,* 391 N.W.2d at 271. However, where the *Young* court was not convinced that sufficient significant testing had been undertaken to insure reliability of electrophoresis, we find sufficient documentation of this procedure's reliability for admissibility.[4] We do not interpret *Frye* to require that the scientific community be restricted to a narrowly defined class of "disinterested" experts. To do so would question the integrity and commitment of hundreds of criminal forensic experts who have the most practical experience in the area of electrophoresis. We do not question the importance of independent scientific documentation. Instead, we simply refuse to read this requirement into *Frye.*

### C. Multi–System Method

■ The multi-system technique is one method of applying the principle of electrophoresis. It is clearly the method which has generated confrontations as to the reliability of electrophoresis in other cases. The issue of the reliability of the multi-system method appears to result from a continuing disagreement among several of the scientists responsible for its development. The cases noted in footnote 3 provide a relevant synopsis of this battle of experts. It is not necessary to discuss the respective merits of each position as the decision that electrophoresis satisfies the *Frye* test dictates that criticism of the specific methodology employed goes to the credibility of the testimony, not admissibility.

### D. Specific Testing Procedures

■ Adams appeals the admissibility of Riis' testimony not only on the basis of the alleged unreliability of the principle and technique, but also that Riis' testing procedures require a finding that the results are unreliable.

Specifically, Adams claims that:

1. Riis engaged in an unscientific selection of "known standard" controls in

**3.** *See,* for example, *State v. Washington,* 229 Kan. 47, 622 P.2d 986 (1981); *State v. King,* 215 N.J.Super. 504, 522 A.2d 455 (1987); *Graham v. State,* 168 Ga.App. 23, 308 S.E.2d 413 (1983).

**4.** *See* Note, "The Admissibility of Electrophoretic Methods of Genetic Marker Bloodstain Typing Under the *Frye* Standard," 11 Okla. City U.L.Rev. 773 (1986), for an in-depth review of the literature available on this issue.

that instead of using different "known standards," he used the same "known standard" numerous times. Adams claims this results in skewed results.

2. Riis' actual test results were so inconclusive, that they could not be used validly for interpretation.

3. Riis did not make any effort to eliminate the possible effect of contaminants (such as dirt and pesticides).

4. Riis may have utilized impure/defective testing plates.

The State responds that:

1. Adams' expert witness testified that utilization of other "known standards" was good practice, but was not absolutely necessary.

2. Riis' practices were adequate under the relevant scientific standards and lack of multiple readings does not affect the accuracy of the test results.

3. Contamination is not a factor because of the limited number of enzymes which could be affected. None of the tests on Adams' blood show any of the changes known to be characteristic of contamination.

4. The evidence which Adams alleges is supportive of impure or defective plates is slight and was refuted by the testimony of Riis and the State's other expert witness.

Adams also questions the reliability of Riis as the interpreter of the results. He claims Riis followed procedures which did not include insuring that his interpretations and conclusions could be rechecked by himself or others. We agree with Adams that the procedures utilized by the person performing the relevant tests and the qualifications of that operator must meet certain basic standards. Proponents of the admissibility of scientific test results must show the reliability of the operator and the procedures. *State v. Guthrie,* 85 S.D. 228, 180 N.W.2d 143 (1970); *State v. Spry,* 87 S.D. 318, 207 N.W.2d 504, 510 (1973), *overruled on other grounds State v. Buckingham,* 90 S.D. 198, 240 N.W.2d 84 (1976); *State v. Helmer,* 278 N.W.2d 808, 812–813

(S.D.1979). We have examined the record in connection with each specific contention and are satisfied that the basic procedures were sufficiently followed to allow the admission of this evidence for the jury's determination of the weight it should be given.

## 2. POST–HYPNOTIC TESTIMONY

Adams made a motion to prohibit the testimony of State witnesses Mike Rensch and Joe Kussela on the ground "that their testimony was in part the product of hypnotic recall and because the use of hypnosis on the witnesses had the effect of irrevocably restricting the Defendant's ability to cross-examine them." After a hearing, the trial court denied Adams' motion and allowed the witnesses to testify, limited to their demonstrable pre-hypnotic recall. Both witnesses made pre-hypnotic statements to the police.

### A. *Admissibility of Hypnotically Enhanced Testimony*

The Eighth Circuit Court of Appeals has thoroughly discussed the issue of the admissibility of the testimony of a witness who has undergone hypnosis to refresh his or her memory in *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112 (8th Cir. 1985) and *Little v. Armontrout,* 819 F.2d 1425 (8th Cir.1987). These two decisions are very persuasive, not only for their in-depth discussion of the phenomenon of hypnosis, the problems associated with its use, and the various legal approaches, but also for their precedential value that this is not a question of witness competency but "an evidentiary problem ... governed by federal law." *Sprynczynatyk, supra* at 1122. Many South Dakota statutes relating to evidentiary issues are based in large part on the Federal Rules of Evidence. (*See* specifically ch. 19–12 and ch. 19–14.) Therefore, appropriate precedential value should be given these Eighth Circuit decisions.

In both *Sprynczynatyk* and *Little* the court acknowledged the use of hypnosis as an investigative tool in criminal and civil cases and the approval of the American Medical Association in 1958 of the use of

hypnosis as a valid therapeutic technique. *Sprynczynatyk, supra* at 1119. The court also discussed at length the problems associated with the accuracy of hypnotically refreshed recall. "These problems include suggestibility, confabulation, pseudomemory, memory hardening, source amnesia, and a loss of critical judgment."[5] *Little, supra* at 1429.

Concern with the reliability of hypnotically enhanced testimony has resulted in three different approaches to determining admissibility. Several jurisdictions adopted a per se admissibility standard, declaring that hypnosis affects the credibility, not admissibility of testimony.[6] On the opposite extreme are courts which have adopted a per se inadmissibility standard.[7] Using the general acceptance of scientific principles test of *Frye, supra*, these courts have found all suggested safeguards to be inadequate to protect against the dangers inherent in hypnosis. These courts are aware of the near impossibility of removing the taint of memory hardening and other problems from post-hypnotic testimony.

After discussing these two approaches, the Eighth Circuit adopted the middle ground which admits the testimony of previously hypnotized witnesses if the proponent of the testimony can demonstrate that adequate procedural safeguards have been followed. *Little, supra; Sprynczynatyk, supra*. This approach is generally sourced to the decision in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981).[8] The *Hurd* court identified six procedural requirements with which the proponent of hypnotically refreshed testimony must comply:

1) Sessions must be conducted by a psychiatrist or psychologist experienced in the use of hypnosis.

2) The professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

3) Information given to the hypnotist prior to the session, by either the State

---

**5.** "A person in a hypnotic trance is subject to a heightened degree of suggestibility." *Little, supra* at 1429. " '[A] hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended.' " *Sprynczynatyk, supra* 'at 1120, *quoting State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980). "Confabulation occurs when an individual fills in details of gaps in his or her memory of an experience." *Little, supra* at 1429. Pseudomemory describes the situation where the hypnotized subject "believes that his posthypnotic recall of the event accurately reflects the event itself." *Little, supra* at 1430. Pseudomemory is interrelated with the problem of memory hardening "which refers to the hypnotized individual's subjective conviction that the memory after hypnosis is accurate." *Little, supra* at 1430. Source amnesia refers to the fact that pre-hypnotic or post-hypnotic statements by others may become so integrated with the subject's actual memory of the event that he cannot discriminate between the possible sources of his knowledge. *Little, supra* at 1430. "An individual loses critical judgment in that he is more apt to speculate about the details of an experience while under hypnosis and later give credence to those details than he would if relying on normal memory recall processes." *Little, supra* at 1430–31.

**6.** *See* cases cited in *Little, supra* at 1431 footnote 14.

**7.** *See* cases cited in *Little, supra* at 1432 footnote 17. The per se inadmissible rule is probably unacceptable under the recent case of *Rock v.*

Arkansas, —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed. 2d 37 (1987):

A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all post-hypnosis recollections. The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial.

**8.** The court in *Hurd* was persuaded by the expert opinions and suggestions offered by Dr. Martin Orne, a recognized expert in the field of hypnosis. The rationale for adopting the *Hurd* approach is that (1) any per se rule removes the question of admissibility from the discretion of the trial courts; (2) a per se rule of inadmissibility is so broad that some valuable and accurate evidence would likely be excluded; and (3) a per se admissibility rule ignores the real dangers of altered testimony and results in a true risk of undue prejudice to the rights of the defendant.

or the defense, must be in writing or other recorded form.

4) Prior to the session, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them.

5) All contacts between the hypnotist and the subject must be recorded. (The use of videotape was strongly encouraged, but not made mandatory.)

6) Only the hypnotist and the subject should be present during any phase of the hypnotic session.

*Hurd, supra,* 432 A.2d at 96–97.

The Eighth Circuit adopted a slightly modified version of the *Hurd* safeguards in *Sprynczynatyk, supra.*[9] The court went on to emphasize that these procedural safeguards are merely a threshold consideration. Adherence to the safeguards does not guarantee admissibility and noncompliance will not always result in inadmissibility. The Eighth Circuit also recommended considering such factors as the appropriateness of using hypnosis in the particular case and whether there is evidence corroborating the hypnotically enhanced testimony in determining whether the proffered testimony is sufficiently reliable and its probative value outweighs its prejudicial effect sufficient to warrant admission. *Id.* at 1123. These procedural safeguards and factors were subsequently affirmed in *Little, supra* at 1434.

### B. *Admissibility of the Testimony of Mike Rensch and Joe Kussela*

From the transcript of the motion hearing, it appears that the trial court had the benefit of both the *Sprynczynatyk* and *Hurd* decisions. Consequently, the trial court attempted to discern what procedural safeguards had been employed.

The trial court made oral findings of fact that: the hypnotist (Dr. Hilland) was a psychologist qualified in the area of hypno-

sis in the particular case and that he was independent of the prosecution and law enforcement; that the actual hypnotic sessions were recorded on audiotape and that Dr. Hilland conducted pre-hypnotic interviews with Kussela and Rensch to determine their pre-hypnotic recall of the events. Even though the trial court did not specify any noncompliance with any safeguards, it restricted the testimony of the witnesses to the contents of the pre-hypnotic statements given to the police and Dr. Hilland.

 Based upon the "procedural safeguards" approach of the Eighth Circuit, which we approve, the trial court's substantial compliance therewith and its subsequent order restricting the testimony to that corroborated by pre-hypnotic statements, the trial court did not abuse its discretion in admitting the testimony of Rensch and Kussela.

### 3. AGGRAVATED KIDNAPPING

 Adams contends that the imposition of punishment for both premeditated murder and "aggravated" kidnapping is a violation of constitutional prohibitions against double jeopardy. His double jeopardy claim is that the proof of death used to substantiate aggravated kidnapping could not be what the legislature intended in requiring proof of "gross permanent physical injury." SDCL 22–19–1. He argues that if the "gross permanent physical injury" were death, then "aggravated kidnapping" would be a mere duplication of felony murder (SDCL 22–16–4).

The grand jury indictment charged Adams with four offenses: premeditated murder in violation of SDCL 22–16–4; felony murder in violation of SDCL 22–16–4; robbery in the first-degree in violation of SDCL 22–30–1 and 22–30–6; and kidnapping "result[ing] in the victim receiving gross permanent physical injury and death" in violation of SDCL 22–19–1. A

---

9. *Id.* at 1123. The court agreed that only an "impartial licensed psychiatrist or psychologist trained in the use of hypnosis" should conduct the session; that any information given the hypnotist should be noted, preferably in written form; that the hypnotist should obtain a detailed account of facts from the subject prior to

hypnosis; that the hypnotic session should be recorded, preferably on videotape; and that no one besides the hypnotist and the subject should be present during any phase of the session unless it is shown that such attendance was essential and steps were taken to prevent the results from being influenced.

jury returned convictions on the charges of premeditated murder, robbery, and kidnapping.

The United States Supreme Court has held that the constitutional prohibition against double jeopardy consists of three separate guarantees. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The third guarantee "protects against multiple punishments for the same offense." The rule for determining whether two separate statutory offenses providing separate punishment are actually the "same offense" was stated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182.

The Court in *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980), further explained:

> We recognized that the *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial. Thus we stated that if " 'each *statute* requires proof of an additional fact which the other does not,' [citation omitted]," the offenses are not the same under the *Blockburger* test. [Citations omitted.] (emphasis original)

447 U.S. at 416, 100 S.Ct. at 2265.

Adams was convicted of premeditated murder [10] under SDCL 22–16–4 which requires proof of: 1) homicide ("the killing of one human being by another" SDCL 22–16–1); 2) with the premeditated design to effect the death of the person killed or of any other human being; and 3) without authority of law.

Under SDCL 22–19–1 kidnapping is:

**22–19–1. Kidnapping**.... Any person who shall seize, confine, ... abduct or carry away any person and hold or detain such person, ... for any of the following reasons:

. . . . .

(2) To facilitate the commission of any felony or flight thereafter;

(3) To inflict bodily injury on or to terrorize the victim ...;

. . . . .

is guilty of kidnapping. Kidnapping is a Class 1 felony, except if the person has inflicted a *gross permanent physical injury* on the victim, in which case it is a Class A felony. (emphassis added)

A comparison of these two statutory provisions clearly demonstrates that each statute requires proof of an additional fact which the other does not.

■ Adams misapprehends the double jeopardy test in *Blockburger, supra.* We must review the statutory provisions to determine if the two charges are essentially the same offense, not the evidence presented at trial. The issue of whether the legislature meant "death" when they established "gross permanent physical injury" is not presented to this court under Adams' argument on appeal. Although Adams attempts to put this argument before the court in his double jeopardy issue, his actual complaint is more closely related to sufficiency of the evidence or interpretation of the phrase "gross permanent physical injury." The trial court appears to have interpreted this phrase to include death. However, this indictment required proof of gross permanent physical injury *and* death. This was conjunctive, not disjunctive, and reference to death can be considered surplusage. Evidence was also presented by one of the State's experts that Jensen's jaw was fractured in two places, his windpipe was fractured, his eyes blackened, he sustained other blows to his head, and knife wounds from stabbing. This evidence appears sufficient to prove "gross permanent physical injury" and, as noted above, is more closely related to suf-

---

**10.** Adams was acquitted on the charge of felony murder.

ficiency of the evidence to convict—a question not presented in this appeal.

We affirm.

All the Justices concur.