STATE of South Dakota, Plaintiff
and Appellee,

v.

Jimmy Lee BOYKIN, Defendant
and Appellant.

No. 15668.

Supreme Court of South Dakota.

Argued March 22, 1988.

Decided Nov. 16, 1988.

Janine Kern, Asst. Atty. Gen., Roger A. Tellinghuisen, Atty. Gen., on the brief, Pierre, for plaintiff and appellee.

John A. Schlimgen, Paul D. Stickney of Breit & Stickney, on the brief, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

On July 21, 1986, Defendant Jimmy Lee Boykin (Boykin) was indicted by a Minnehaha County grand jury on four counts: First-degree murder, first-degree mur-

der/felony murder, first-degree robbery, and kidnapping. After a jury trial, Boykin was found guilty on all of the counts except felony murder. The trial court sentenced Boykin to twenty-five years in the State Penitentiary on the robbery count, and life imprisonment without parole on the murder and kidnapping counts. Boykin appeals, arguing that the trial court erred in seven respects:

(1) Unauthorized communications between the bailiff and jurors deprived him of a fair trial;

(2) Admission of an incriminating statement he made to a police officer during a strip-search;

(3) Denial of a motion for mistrial following hearsay testimony regarding a codefendant's statement which was not redacted as the court had directed;

(4) Admission of Boykin's tennis shoes into evidence after the State negligently stored them allowing potentially exculpatory bloodstain evidence to deteriorate;

(5) Allowing testimony from State witnesses who had undergone hypnosis;

(6) Sufficiency of evidence to support the verdicts; and

(7) Denial of Boykin's motion for a change of venue.

Finding no grounds for reversal, we affirm Boykin's convictions.

## FACTS

At 3:45 a.m., on June 19, 1986, Jean Larson was awakened by screams. She awakened her husband, and they looked out their farmhouse window. Larsons saw a truck in their driveway, one or more persons walking in front of the vehicle's headlights, and heard loud, angry conversation. Later that morning, on their way to town, the Larsons found a stabbed, beaten corpse in their cornfield. The body was that of DeWayne Jensen (Jensen), an elderly man who disappeared early in the morning of that day, midway through his newspaper delivery route in Sioux Falls.

Boykin and a companion, Howard Joseph Adams (Adams), were arrested the next day, June 20, 1986, in Mitchell, in connection with an unrelated robbery. Later, both were implicated in Jensen's murder, and transported to the Minnehaha County Jail.

Witnesses provided some details of Boykin's and Adams' activities in the time before and after the murder. They were stranded in Sioux Falls on June 18, 1986, when their car broke down. Looking for a friend, Harry Cokens, they encountered Marlene Anawski, who lived about four blocks from the Prairie Market. Anawski offered to let them spend the night in a tent in her backyard, and they accepted.

That night, Boykin and Adams shared a bottle of rum at a party at Mrs. Anawski's home. After the party, which ended at 12:45 a.m., both Boykin and Adams took a shower. Adams changed clothes, borrowing a shirt. He and Boykin then walked to the nearby Stockmen's Bar. Boykin stayed in the bar until approximately 3 a.m. Adams left around 2 a.m., but remained in the parking lot until Boykin joined him. They proceeded on foot to the Prairie Market parking lot where disputed testimony indicates their car was located.

By 5 a.m., they were back at their tent in Mrs. Anawski's backyard, asleep. At 9:30 a.m., Adams' wife picked them up. They had discarded their shirts, including Adams' borrowed one, and Adams' back was covered with scratches and a dark tarry substance. When Mrs. Anawski questioned Adams about losing her husband's shirt, Boykin was very quiet.

Investigation revealed that Jensen had started his morning deliveries at about 3 a.m. on June 19. The newspapers Jensen was to deliver to the Prairie Market were found in a jumble, although the first delivery on his route had been completed normally. He made no deliveries at stops scheduled beyond the Prairie Market. Jensen's pickup truck was found three blocks from the Anawski home, with bloodstains matching Adams' blood on the top, bumper, and side. Similar bloodstains were found on an abandoned stack of Jensen's papers. (Adams and Boykin both have type A

blood, though it differs in other respects. Jensen had type O blood.) The fillet knife Jensen kept in the vehicle to cut newspaper bindings was never found, but his stab wounds were well matched to an identical knife.

While in jail, Boykin made two self-incriminating statements. The first occurred during a strip-search, when he remarked to Deputy Sheriff Arntz that his shoes might match shoe prints at the site where Jensen was found. The second came in a conversation overheard by Arntz. When Adams stated "We aren't convicted yet," Boykin replied: "It looks like they've got us now."

Adams and Boykin were given separate trials. Adams was convicted of murder, robbery, and kidnapping. This Court affirmed Adams' convictions in *State v. Adams*, 418 N.W.2d 618 (S.D.1988). Adams raised the same arguments as Boykin now does regarding testimony of previously hypnotized witnesses. All seven issues are treated seriatim.

## DECISION

### I. UNAUTHORIZED COMMUNICATION BETWEEN BAILIFF AND JURORS

■ Boykin first asserts that communication between Bailiff Sandy Friessen and jurors during the second day of jury deliberations was prejudicial and deprived him of a fair trial. We disagree, and affirm the trial court's finding that Boykin suffered no prejudice.

The communication in question took place on Thursday, January 29, 1987, during the jury's lunch break. According to Bailiff Friessen, Janet Johnson, a juror, asked her: "What happens if we can't come in with a decision?" Friessen replied:

Well if you can't come in with a decision, the Judge and the attorneys talk it over on how long you have been deliberating, then it's up to them whether to send you back into the juryroom and say deliberate some more or they're going to take your answer as whatever you give for an answer.

I don't know when you're going to come in with a decision. My guess is if you're telling me that you're gonna come in after lunch and say you can't make a decision, I think the Judge would probably send you back into the juryroom, you know, and try to talk some more and try to come to a decision.

At no time did any member of the jury indicate that they were deadlocked or having any difficulty reaching a decision, although, according to Johnson, the jurors did discuss, among themselves, what might happen if they did become deadlocked. The jury continued its deliberations, and rendered its verdict the following morning, on January 30, 1987.

Boykin filed a motion for new trial based, in part, on the bailiff/juror communication. A hearing was held on February 2, 1987, whereat Bailiff Friessen testified. The hearing was continued two days later, on February 4, at which time Janet Johnson testified that she did not remember her conversation with Bailiff Friessen. Juror Johnson also testified that no attempt by any juror to communicate with the judge was frustrated by Friessen or anyone else, that no attempt to influence either her vote or the time of the verdict was made, and that there was no discussion among the jurors of Friessen's statement. After Johnson's testimony, the trial court concluded that Boykin, beyond a reasonable doubt, had suffered no prejudice. On February 9, 1987, Boykin submitted an affidavit from Anita Greenhoff, another juror, to the effect that she had overheard the exchange between Friessen and Johnson. After the prosecutor declined to offer new evidence, the trial court indicated that it was still satisfied that no prejudice had occurred, and denied Boykin's motion for new trial.

State and Boykin agree that the bailiff's communication was improper (see SDCL 23A–25–5 [1] and SDCL 23A–25–8 [2]). The

---

**1.** SDCL 23A–25–5 provides (in pertinent part): The officers shall not permit any person (including themselves) to communicate with the jurors or to ask whether they have agreed upon a verdict except by order of court.

**2.** SDCL 23A–25–8 provides:

standard set forth by the United States Supreme Court in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), is controlling:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox v. United States*, 146 U.S. 140, 148–150, 36 L.Ed. 917, 920, 921, 13 S.Ct. 50, [52–54] [ (1892) ]; *Wheaton v. United States*, (CA 8th S.D. [1943]) 133 F.2d 522, 527.

*Remmer*, 347 U.S. at 229, 74 S.Ct. at 451, 98 L.Ed. at 656. South Dakota case law is entirely consistent with *Remmer*. *See State v. Swallow*, 350 N.W.2d 606, 610 (S.D.1984); *State v. Holt*, 79 S.D. 50, 51–52, 107 N.W.2d 732, 733 (1961); *State v. McCoil*, 63 S.D. 649, 652, 263 N.W. 157, 158 (1935).

Boykin maintains that Bailiff Friessen's remarks were in the nature of a "get together" instruction or *"Allen* charge," a name derived from *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (concerning supplemental jury instructions encouraging a deadlocked jury to reach unanimous agreement). This Court disapproved the use of such supplemental instructions urging unanimity in *State v. Ferguson*, 84 S.D. 605, 612, 175 N.W.2d 57, 61 (1970): "To assure the integrity and independence of criminal jury verdicts in the future the use of supplemental get-together instructions is not commended." The substance of Bailiff Friessen's communication, however, belies Boykin's assertion. The Kansas Supreme Court found no *"Allen* charge" coercion where "[t]here is nothing in the bailiff's comments compelling the jury to reach a verdict—no implication that they must remain sitting until a verdict was reached or, in any other way, putting pressure on the jury to reach a verdict." *State v. Lovely*, 237 Kan. 838, 840, 703 P.2d 828, 831 (1985). Here, the bailiff told Johnson, among other things, that the judge and attorneys might decide to let them go. As in *Lovely*, the communication was not coercive. Johnson's testimony as to the juror's lack of difficulty during deliberation, as well as the prosecutor's cross-examination of Bailiff Friessen, effectively rebutted the presumption of prejudice.[3] As the State presented testimony explaining the improper communication, a question of fact arose for determination by the trial court as to whether the defendant suffered any prejudice. *State v. Olesen*, 86 S.D. 367, 373, 196 N.W.2d 362, 365 (1972). On this record, the trial court's determination that no prejudice resulted was not clearly erroneous.

## II. ADMISSION OF BOYKIN'S INCRIMINATING STATEMENT MADE DURING A STRIP–SEARCH

On July 18, 1986, Boykin was undergoing a strip-search in the clothing storage area of Minnehaha County Jail, a procedure undertaken by the police because Boykin was about to be transported to Davison County. This room was routinely used by police for strip-searches. During the search, Boykin began complaining about

After jurors have retired for deliberation, if there is a disagreement among them as to any part of the testimony or if they desire to be informed upon a point of law arising in the case, *they shall ask the officer having them in charge to convey their written request to the court.* Any information allowed by the court must be given in the presence of, or after notice to, the prosecuting attorney and the defendant or his counsel, and must be taken down by the court reporter. (Emphasis supplied.)

3. The timing of the communication, during lunch on Thursday, when considered in light of the jury's delivery of its verdict the following morning, also militates in favor of the trial court's denial of Boykin's motion for new trial. *See United States v. Hooten*, 662 F.2d 628, 636–37 (9th Cir.1981).

police having earlier taken his tennis shoes, and that he would have to get another pair from Goodwill. Deputy Sheriff Doug Arntz, the officer conducting the search, commented that they had probably taken the shoes to make casts or take pictures to match the shoes to shoe prints at the crime scene. Boykin replied: "Yeah, maybe they do." The conversation was initiated by Boykin, and Arntz did not ask him any questions about the shoes. Boykin had been given *Miranda* warnings, but was not given any such warnings by Arntz in the clothing storage room. On January 15, 1987, a hearing was held on a motion to suppress Arntz' testimony regarding Boykin's statement. The trial court entered findings of fact to the effect that Boykin's statement was not made in response to any interrogation or questioning by police and Deputy Sheriff Arntz' remark could not reasonably be construed as an attempt to elicit any incriminating response on Boykin's part. Boykin's motion was denied by the trial court.

Boykin now alleges that denial of his suppression motion was erroneous, and that the admission of Arntz' testimony at his trial violated his Fifth Amendment rights against self-incrimination. Specifically, Boykin maintains that Arntz' comment was a subterfuge to elicit an incriminating response by trickery, and the statement, therefore, should have been suppressed under *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). We disagree.

In *Innis*, the United States Supreme Court vacated the Rhode Island Supreme Court's reversal of a conviction because the state court had stretched Fifth Amendment protections (*see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) too far. The defendant in *Innis* led police to a shotgun used in a murder, after overhearing one of two policemen, riding in a police car; one policeman with him mused that children from a nearby school for the handicapped might find the weapon and hurt themselves. Justice Stewart, in the opinion of the Court, wrote:

A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301–02, 100 S.Ct. at 1690, 64 L.Ed.2d at 308 (emphasis in original; footnotes omitted). On the facts of *Innis*, the Court held that the defendant, though in custody, had neither been interrogated nor subjected to the functional equivalent. *Innis*, 446 U.S. at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309.

Arntz' offhand remark could not be considered to trigger Fifth Amendment concerns. Boykin's response was voluntary, as the trial court found. The same result was reached in *State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984) (defendant, during a routine strip-search, initiated conversation with a policeman, and remarked that useable evidence might be found on his shirt and shoes taken at his arrest. Held: No interrogation). *See also Harding v. Lewis*, 641 F.Supp. 979, 997–98 (D.Ariz.1986).

We find no error by the trial court on this issue. The record does not support Boykin's allegation of subterfuge and does indicate that Boykin initiated the incriminating exchange.

### III. ADMISSION OF A CODEFENDANT'S UNREDACTED STATEMENT

■ At trial, the court granted Boykin's motion to prevent the State from using hearsay statements from Adams against Boykin unless they were changed from the active to the passive voice (redaction) to remove references to Boykin.[4] A State witness, who appears to have been poorly prepared, later testified that Adams had

---

4. For example: "We drove the car" would be redacted to "The car was driven."

said that "the money wasn't what they were after, but the keys is what was worth real money." Boykin moved for a mistrial, which the court denied. The court, instead, issued an instruction limiting the jury's consideration of the remark to the question of Adams' guilt. Again, we affirm the trial court.

Boykin relies on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), wherein a conviction was reversed after a non-testifying codefendant's confession, that he and Bruton committed robbery, was admitted with a limiting instruction. The Supreme Court held that this violated Bruton's Sixth Amendment right to confront his accusers, expressly overruling earlier case law on the point. *Bruton, id.*

> Evans' [the codefendant] confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand. Petitioner thus was denied his constitutional right of confrontation.

*Bruton*, 391 U.S. at 128, 88 S.Ct. at 1623, 20 L.Ed.2d at 480. *Bruton* involved a joint trial, whereas this case involved severed trials, but *Simmons v. United States*, 440 F.2d 890 (7th Cir.1971), reached the same result in severed trials. The error in *Simmons* was not considered harmless because the only other admissible evidence connecting the defendant to the crime was uncorroborated testimony by a single witness. *Simmons, id.*

We deign to express that the United States Supreme Court has not ruled on the precise point at issue here. In *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176, 186 (1987), that Court contrasted a codefendant's "confession [that] was not incriminating on its face, and became so only when linked with evidence introduced later at trial" to *Bruton's* "powerfully incriminating" statements, and observed that in the case of the former there does not exist the overwhelming probability that a jury will disregard limiting instructions. *Richardson, id.* However, the Court in *Richardson* declined to express an opinion on the admissibility of a "confession in which the defendant's name has been replaced with a symbol or neutral pronoun." *Richardson*, 481 U.S. at 211 n. 5, 107 S.Ct. at 1709 n. 5, 95 L.Ed.2d at 188 n. 5.

The *Bruton* rationale does not, in all cases, require reversal. As noted in *Bruton* itself, " '[a] defendant is entitled to a fair trial but not a perfect one.' " *Bruton*, 391 U.S. at 135, 88 S.Ct. at 1627, 20 L.Ed.2d at 484 (citation omitted). Unlike *Bruton*, where the codefendant's confession directly named the defendant as a participant, Adam's statement makes no direct reference to Boykin. The reference to "they" only states that Adams was not alone, a fact the testimony of several independent witnesses supports.[5] Boykin's own statements regarding his shoes and his "It looks like they've got us now" comment to Adams while in jail overwhelmingly outweight the minimally inculpatory effect of an isolated "they" as used by Adams. Adams' statement, in this setting, is not a "powerfully incriminating" statement as envisioned by *Bruton*. *See Bruton*, 391 U.S. at 135-36, 88 S.Ct. at 1627–28, 20 L.Ed.2d at 485.

Despite violation of Boykin's Sixth Amendment right to confrontation through admission of Adams' unredacted statement, we hold the error, in this case, to be harmless. It was a cumulative statement. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (cited with approval in *Cruz v. New York*, 481 U.S. 186, 193–194, 107 S.Ct. 1714, 1719, 95 L.Ed. 2d 162, 172 (1987)). Error of constitutional dimension may be deemed harmless where the reviewing court finds, absent the error, it is clear beyond a reasonable doubt that the jury would have returned a conviction. *State v. Miller*, 429 N.W.2d 26, 36 (S.D. 1988); *State v. Garritsen*, 421 N.W.2d 499 (S.D.1988); *High Elk v. State*, 344 N.W.2d 497 (S.D.1984).

---

**5.** Attention is drawn to Mrs. Larson's testimony indicating that more than one person passed in front of the truck lights at the site of the victim's body. Two witnesses testified that Boykin and Adams told them at the Stockmen's Bar that they were about to come into some money.

## IV. ADMISSION OF BOYKIN'S TENNIS SHOES AND ASSOCIATED BLOOD TEST RESULTS AFTER THE STATE'S NEGLIGENT STORAGE ALLOWED POTENTIALLY EXCULPATORY EVIDENCE TO DETERIORATE

Boykin and Adams were arrested on June 20, 1986, in Mitchell, South Dakota. The Mitchell police took Boykin's tennis shoes, which exhibited a minute bloodstain, later determined by ABO testing to be human blood of Type A. Both Adams and Boykin have Type A blood, but Jensen, the victim, did not. The shoes and the associated bloodstain were not refrigerated until they were received at the Department of Criminal Investigation (DCI) Laboratory in Pierre on July 2, 1986. Rex Riis, a DCI criminologist, successfully performed the ABO tests on the bloodstain, but his attempt to carry out electrophoretic tests [6] on the bloodstain was a failure. Electrophoretic tests, if successful, could have determined whether the blood on the shoes was that of Adams or Boykin, or that of a third person. Boykin made a motion to exclude any testimony concerning the results of tests on the shoe bloodstain, asserting that the State's negligence in failing to refrigerate the shoes deprived him of potentially exculpatory evidence.

It is clear that suppression by the prosecution of evidence favorable to an accused violates due process rights under the Fourteenth Amendment where the evidence has been requested by the accused and is material either to guilt or punishment, irrespective of the good or bad faith of the prosecutor. *State v. Clabaugh,* 346 N.W.2d 448, 450 (S.D.1984) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)).[7] "[W]hen the Government has been responsible for delay resulting in a loss of evidence to the accused, we have recognized a constitutional violation only when loss of the evidence prejudiced the defense." *United States v. Valenzuela–*

*Bernal,* 458 U.S. 858, 868, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193, 1203 (1982). The extent of the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants is, however, not precisely clear. *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

> Whenever potentially exculpatory evidence is permanently lost [through prosecutorial neglect or oversight], courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.

*Trombetta,* 467 U.S. at 486, 104 S.Ct. at 2533, 81 L.Ed.2d at 421 (citing *Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440).

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs,* 427 U.S. [97], at 109–110, 96 S.Ct. 2392, at 2400, 49 L.Ed.2d 342 [ (1976) ], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Trombetta,* 467 U.S. at 488–89, 104 S.Ct. at 2534, 81 L.Ed.2d at 422 (footnote omitted). The difficulty Boykin faces here is proving the materiality of the allegedly lost evidence.

■ According to Rex Riis, the criminologist, the bloodstain in question was so minute that electrophoretic testing was as likely to be unsuccessful through insufficiency of the amount of blood itself as through failure to freeze the sample. There is, according to this record, no showing that government mishandling deprived Boykin of any evidence because the blood sample was so small. As, at trial, the blood on the shoe could not be proven to be Adams' or Boykin's, and inasmuch as the

---

6. A process this Court approved in the appeal of Boykin's codefendant, Adams, in *State v. Adams,* 418 N.W.2d 618 (S.D.1988).

7. Accidental destruction of blood samples in the mails does not constitute a violation of due process. *State v. Huettl,* 379 N.W.2d 298 (S.D. 1985).

time the shoe was bloodied could not be proven, the inculpatory inferences a jury could draw from the ABO test were very weak, as was brought out at trial. The lack of electrophoretic test results lessened the inculpatory effect of the ABO test results admitted at trial. Even were the blood actually proven to be Adams', the proximity of Adams and Boykin in the tent where they slept on the morning of the murder could explain the stain in a light favorable to Boykin.

In a case where the State destroyed a blood sample in proving a bloodstain on the defendant's coat was Type A (as was the victim's), the Connecticut Supreme Court rejected the defendant's argument that he was prejudiced by the sample's destruction:

His principal claim is that, with the more sophisticated testing procedures his expert would have used, the blood groupings might have been more narrowly confined. That the evidence was less significant than it might have been if different techniques had been used did not, as far as can be ascertained, prejudice the defendant any more than the state. Counsel had the opportunity to explain the limited probative value of this evidence to the jury and presumably did so.

*State v. Morrill*, 197 Conn. 507, 549, 498 A.2d 76, 100 (1985). *Morrill* listed the following factors which courts should consider regarding the admissibility of lost or destroyed evidence: 1) The reason for the unavailability of the evidence; 2) the materiality of the evidence; 3) the likelihood of mistaken interpretation of it by witnesses or the jury; and 4) the prejudice to the defendant caused by the unavailability of the evidence. *Morrill, id.* Here, the State was potentially culpable in that the blood was negligently left unfrozen, but the defendant did not show electrophoretic test-

ing was possible, absent the negligence, and two persons with Type A blood are involved, making the inculpatory inferences weaker.

Considered in the context of this case, the failure to freeze the blood sample did not violate Boykin's right to due process. "[A] defendant's due process rights are violated only if the undisclosed evidence creates a doubt which did not otherwise exist." *State v. Sarabia,* 118 Wis.2d 655, 670, 348 N.W.2d 527, 536 (1984) (interpreting *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). The lack of electrophoretic results here did not deprive Boykin of any reasonable doubt because the ABO evidence that was presented at trial was so doubtful itself. We therefore find no reversible error in the trial court's admission of the ABO blood test results. The alleged exonerating effect of any electrophoretic testing, considered in conjunction with the evidence produced at trial, would not have altered the ultimate verdict of the jury. *State v. Cody,* 323 N.W.2d 863, 868 (S.D.1982).

## V.  HYPNOSIS OF WITNESSES

▆ Boykin's challenge to the trial court's admission of post-hypnotic testimony of State witnesses Mike Rensch and Joe Kuusela is similar to that presented by Adams in *State v. Adams,* 418 N.W.2d 618, 622–24 (S.D.1988). As in *Adams,* we affirm on the basis that the trial court substantially followed the "procedural safeguards" approach to such testimony set out by the Eighth Circuit Court of Appeals in *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112 (8th Cir.1985),[8] and *Little v. Armontrout,* 819 F.2d 1425 (8th Cir.1987), and limited the witnesses to testimony corroborated by pre-hypnotic statements. *See Adams,* 418 N.W.2d at 624.

---

**8.** In *Sprynczynatyk,* the Eighth Circuit required, as a threshold consideration, that the following procedural safeguards be met:

1) Only an impartial licensed psychiatrist or psychologist trained in the use of hypnosis should conduct hypnotic sessions;

2) Any information given to the hypnotist should be noted, preferably in written form;

3) The hypnotist should obtain a detailed account of facts from the subject before hypnosis;

4) The session should be recorded, preferably on videotape; and

5) No one other than the hypnotist and subject should be present during the session, unless it is shown the other's attendance was essential and that steps were taken to avoid influencing the results.

*Sprynczynatyk,* 771 F.2d at 1123 n. 14; *State v. Adams,* 418 N.W.2d at 624 n. 9.

The trial court did not abuse its discretion. *Adams, id.*

## VI. INSUFFICIENT EVIDENCE

We affirm the trial court's denial of Boykin's motions for judgment of acquittal based on insufficiency of evidence to support the jury's verdict. In determining the sufficiency of evidence on appeal, the question is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Banks,* 387 N.W.2d 19, 27 (S.D.1986); *State v. West,* 344 N.W.2d 502 (S.D.1984). In making that determination, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. *Banks, id.*

Here, evidence supports inferences that Boykin was in the company of Adams at all relevant times. They were placed in the Prairie Market parking lot at the time the victim's route was interrupted. Two persons were seen at the farm where the body was discarded. The victim's truck (linked to Adams by blood evidence) was found within three blocks of the Anawski residence where Boykin and Adams were. Two witnesses, Bob Bankes and Harry Cokens, testified that Adams and Boykin, shortly before the murder, indicated that they were going to get some money. Jensen was, apparently, robbed. Also, Boykin's own statements linked him to the crime (to Arntz: "Maybe they do"; to Adams: "It looks like they've got us now."). The evidence, and legitimate inference therefrom, was sufficient to convict Boykin.

## VII. CHANGE OF VENUE

Boykin alleges that the trial court abused its discretion in refusing to grant his motion for change of venue, and refusal to grant him ten additional peremptory challenges. Boykin alleges that fair trial was impossible because of the volume of pretrial publicity, and pretrial knowledge of the case on the part of jurors, as shown by an additional survey he presented to the trial court.

We disagree. "Pretrial publicity alone is not enough to deny a fair trial or, in other words, to warrant a change in venue." *State v. Luna,* 378 N.W.2d 229, 236 (S.D. 1985) (citing *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)). Qualified jurors may have some knowledge of the facts and issues involved without burdening a defendant's Sixth Amendment rights. *State v. Bonrud,* 393 N.W.2d 785, 791 (S.D.1986); *Luna,* 378 N.W.2d at 236. Boykin has not shown unfair press coverage, and failed to transcribe the voir dire of potential jurors. A public opinion survey authorized by the trial court was also not preserved in this record by Boykin. As voir dire is the better forum for ascertaining the existence of hostility towards the accused (see *Bonrud,* 393 N.W.2d at 791), and no record exists for us to review, we cannot conclude that Boykin has suffered any prejudice. Appellant, as the party claiming error, had the responsibility to insure that a record was made. *State v. Jones,* 416 N.W.2d 875, 878 (S.D.1987). The settled record is the sole evidence of the circuit court's proceedings and, when confronted with an incomplete record, our presumption is that the circuit court acted properly. *Id.* Boykin's convictions are, therefore, affirmed.

All the Justices concur.