Harold Clifford HIGH ELK,
Petitioner and Appellant,

v.

STATE of South Dakota, Appellee.

No. 14134.

Supreme Court of South Dakota.

Argued Oct. 26, 1983.

Decided Feb. 22, 1984.

Rehearing Denied March 27, 1984.

Joseph Neiles, Minnehaha County Public Defender, Sioux Falls, for petitioner and appellant.

Richard Dale, Asst. Atty. Gen., Pierre, for appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

WOLLMAN, Justice.

This case is before us for the second time. Petitioner's conviction of first-degree rape was affirmed on direct appeal. *State v. High Elk*, 298 N.W.2d 87 (S.D. 1980). The present appeal is from an order denying petitioner's request for post-conviction relief. We affirm.

A few days prior to July 11, 1979, petitioner and his girlfriend, Rachel, went to Sioux Falls and moved in with Blanche Big Eagle and her two children, a twenty-two month-old girl and a nine-month-old boy.[*] Petitioner, Rachel, Blanche and one Jim Martin were at Blanche's home drinking much of the day on July 11, 1979. Sometime after 11:00 p.m., Jim Martin left the home. Blanche and Rachel then left to try to find him. When the two women left, Blanche's daughter, clothed with a t-shirt and a disposable diaper, was asleep on the porch. Petitioner was the only person in the home with the two children during Blanche and Rachel's absence. Some twenty minutes later the women returned to find petitioner, who was now wearing a different shirt, with a diaper in his hand, apparently preparing to change the little girl's diaper. The child had no diaper on at the time and was lying on her stomach. Prior to that time petitioner had never assisted in changing the little girl's diaper.

After placing a diaper on the child, Rachel took the little girl to Blanche's second-floor bedroom. The three adults sat on the front porch for a few hours, during which time petitioner left and went into the house through the front door three or four times while Blanche and Rachel remained on the front porch. Petitioner's return to the

---

[*] In our opinion in the direct appeal we referred to Rachel as petitioner's wife. Petitioner testified at the post-conviction hearing that she was his girlfriend.

front porch on at least one of these absences was by way of the back door and then around the outside of the house. When Blanche went to bed she checked the children's diapers. She observed blood between the little girl's legs and on the bed. She also observed that the sheets that had been on·the bed earlier in the day had been removed.

The police and an ambulance were summoned to the house at approximately 3:00 a.m., July 12. Petitioner was standing near a water spigot located near the front porch of the residence when the police arrived. The police noticed a fresh blood stain, subsequently found to match the victim's blood group, on the cushion of a living room chair. The police also observed blood on the inside of petitioner's right wrist and on the jeans that ·he was wearing. In their search of the yard, the police found two bed sheets from the bed on which the little girl was sleeping. One of the sheets had been stuffed into the opening of a doghouse located some 50 feet from the rear of the house. They also found a diaper, and a towel belonging to petitioner, both of which were wet, under the water spigot. Petitioner's bowling bag found in the front room contained a pair of petitioner's jeans. There was blood on these jeans and the crotch area was wet. One police officer testified that the blood on these jeans appeared to be dried. Another officer testified that he could not tell whether this blood stain was wet or dry. Petitioner was wearing no underwear when he was strip searched upon being taken to the police station from the residence. No blood was observed on his body during the strip search other than that on his right wrist.

Petitioner's trial counsel filed a pretrial discovery motion that requested, among other things, "all reports of any kind by an expert technologist, or scientific authority which will be used by the State in its prosecution," and which also requested all other evidence in the State's possession which would be favorable to petitioner or relevant to his guilt. On September 13, 1979, petitioner's trial counsel signed a receipt for police reports and two written statements regarding petitioner's case. A Federal Bureau of Investigation laboratory report dated September 14, 1979, reveals that of eight specimens sent in for chemical analysis, only the seat cushion cover and one sheet had group "O" blood on them. The victim of the rape has group "O" blood. The seat cushion cover, one sheet, two shirts, and one pair of jeans had group "A" blood on them. Petitioner has group "A" blood. Grouping tests conducted on the blood on the other pair of jeans and on the towel were inconclusive.

During cross-examination by petitioner's trial counsel, Blanche testified that petitioner had gotten blood on his clothes the night before the rape when she, Blanche, hit him on the forehead with a decanter because he was beating up Rachel. Subsequent to that testimony, one of the investigating officers testified on direct examination regarding his observations of the blood stains on the victim's body and on the chair cushion. He testified further that the crotch area appeared to be wet on the jeans taken from the bowling bag. During his cross-examination of this officer, petitioner's trial counsel elicited the following testimony:

Q Did you notice any blood on the jeans? [the jeans taken from the bowling bag]

A Yes.

Q Dried or wet?

A Well, the whole crotch area ˌwas wet with something. The blood appeared dry.

Q The blood appeared dried?

A Yes.

Q But the blood on the sofa or chair was wet?

A Yes.

Another investigating officer testified on direct examination that he had observed dried blood on petitioner's right wrist. During counsel's cross-examination of this officer, further mention of blood on the jeans was brought out as follows:

Q Blood stains on the jeans, were they dry blood stains?

A On which jeans?

Q Isn't there some jeans that had some blood that you said?

A There was actually two pair of jeans I thought that had blood on them.

Q Wet or dry blood?

A The jeans that Mr. High Elk was wearing at the time had a spot which I thought was dried blood. And the jeans that we found in the bag I personally could not tell whether it was wet or dry. The whole jeans— the crotch area of the jeans was wet.

At the post-conviction relief hearing, petitioner's counsel testified that he did not remember receiving any reports from the state's attorney's office subsequent to September 13, 1979, and that if he had received the F.B.I. report he would have taken action with regard to it. The former state's attorney who had prosecuted petitioner testified that he was sure he had received a copy of the F.B.I. report. He also testified that it had been his practice to deliver copies of such reports to defense counsel and that he was "pretty sure, but not absolute certain" that he had delivered the report in issue to petitioner's trial counsel. He also testified that he recalled discussing the results of the F.B.I. laboratory tests with petitioner's trial counsel and informing him that the State did not intend to call the F.B.I. agent who had prepared the report. The former state's attorney also recalled that petitioner's trial counsel had come to the state's attorney's office to look at the report. The trial court found that the results of the F.B.I. report, if not the report itself, had been communicated by the state's attorney to petitioner's trial counsel prior to trial.

Petitioner has raised several claims of alleged ineffective assistance of counsel. We find it necessary, however, to discuss only the contention that trial counsel erred in eliciting the testimony regarding the blood on petitioner's jeans and then compounded this error by failing to utilize the results of the F.B.I. laboratory report to prove that the blood on one pair of petitioner's jeans could not have come from the victim.

In ruling upon this contention, we will accept the trial court's finding that the results of the F.B.I. laboratory test report, if not the report itself, had been communicated to petitioner's trial counsel by the state's attorney prior to trial.

■ The right to assistance of counsel guaranteed by Article VI, § 7 of the South Dakota Constitution and by the Sixth Amendment to the United States Constitution means adequate and effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Grooms v. State*, 320 N.W.2d 149 (S.D.1982); *State v. McBride*, 296 N.W.2d 551 (S.D.1980); *State v. Pieschke*, 262 N.W.2d 40 (S.D.1978).

■ In reviewing a claim of ineffective assistance of counsel, we begin with two premises: (1) an attorney is presumed competent, and (2) the party alleging incompetence has a heavy burden in establishing ineffective assistance. *Miller v. State*, 338 N.W.2d 673 (S.D.1983); *Grooms v. State*, *supra*.

We have held that the right to effective assistance of counsel envisages that counsel "will investigate and consider possible defenses and, if none, other procedures, and exercise his good faith judgment thereon." *State ex rel. Burns v. Erickson*, 80 S.D. 639, 646, 129 N.W.2d 712, 716 (1964), *quoted in State v. Pieschke, supra*. *See also Miller v. State, supra*.

■ In judging whether counsel has failed to provide effective assistance we must determine whether counsel exercised "the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *United States v. Easter*, 539 F.2d 663, 666 (8th Cir.1976). *See also Lufkins v. Solem*, 716 F.2d 532 (8th Cir.1983); *Miller v. State, supra*, 338 N.W.2d at 678 n. 7.

■ It is not our function to second guess the decisions of experienced trial at-

torneys regarding matters of trial tactics. *Grooms, supra; McBride, supra; State v. Walker,* 287 N.W.2d 705 (S.D.1980). As we said with respect to claims of errors in trial tactics in *State v. Pieschke, supra:*

> We approach such allegations with the realization that it is not difficult after contemplation and searching analysis of the record of a trial to find imperfections and irregularities therein and to conclude that both the trial judge and losing counsel might well have done a better job.

262 N.W.2d at 46, quoting *United States v. Bad Cob,* 560 F.2d 877, 881 (8th Cir.1977).

■ It is always easy to use hindsight to cast doubt on a lawyer's trial tactics, but a wrong or poorly advised exercise of judgment is not alone enough to support a subsequent claim of ineffective counsel. *United States v. Blue Thunder,* 604 F.2d 550 (8th Cir.1979); *United States v. Bad Cob, supra; Robinson v. United States,* 448 F.2d 1255 (8th Cir.1971).

■ After giving due deference to these cautionary principles, we agree with petitioner that trial counsel should not have elicited the testimony concerning the blood on petitioner's jeans. The record does not reveal what possible trial strategy could have been served by introducing this testimony, nor has the State suggested any plausible explanation for trial counsel's decision to do so. Further, we agree with petitioner that once having elicited this testimony, trial counsel should have utilized the F.B.I. laboratory report in an attempt to show that the blood on the jeans could not have come from the victim. To this extent, then, counsel did not provide effective assistance.

■ Not every instance of ineffective assistance requires the reversal of a conviction, however, for a defendant must demonstrate that he has suffered prejudice as a result of the ineffective representation. *Miller v. State, supra; Grooms v. State, supra; State v. Pieschke, supra.* Moreover, the prejudice must be material to warrant relief by way of reversal. *Lufkins, supra; Tinlin v. Parratt,* 680 F.2d 48 (8th Cir.1982); *McQueen v. Swenson,* 498 F.2d 207 (8th Cir.1974).

■ We conclude that counsel's failure to utilize the F.B.I. report did not substantially prejudice petitioner's case. Put another way, the error was harmless. As we pointed out in *State v. Waller,* 338 N.W.2d 288, 291 (S.D.1983), an error even of constitutional magnitude may be deemed harmless when a review of the record satisfies the reviewing court that absent the error it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. *See United States v. Hasting,* — U.S. —, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Kost v. State,* 344 N.W.2d 83 (S.D. 1984); *State v. Heumiller,* 317 N.W.2d 126 (S.D.1982); *State v. Rosales,* 302 N.W.2d 804 (S.D.1981).

When viewed in the light of this test, we are satisfied that the use of the F.B.I. report would not have affected the jury's verdict. The circumstantial evidence of guilt was overwhelming: Petitioner was the only adult near the victim during the time the rape must have occurred. All of his movements and conduct and all of the other circumstances pointed to his guilt and were inconsistent with any reasonable theory of innocence. Petitioner's trial counsel established that the dried blood on the jeans that petitioner was wearing at the time of his arrest in all probability had come from the blow to the head administered by Blanche the day before the rape. The most that the F.B.I. report could have established would have been that the blood on one pair of jeans could not have come from the victim. The report was thus not truly exculpatory inasmuch as it did not tend to negate the guilt or support the innocence of petitioner. *Commonwealth v. Pisa,* 372 Mass. 590, 363 N.E.2d 245 (1977); *Commonwealth v. Gee,* 467 Pa. 123, 354 A.2d 875 (1976); *Miller v. State,* 344 N.W.2d 78 (S.D.1984).

It is true, of course, that in our opinion affirming the conviction on direct appeal, we stated that blood stains were discovered on petitioner's jeans. 298 N.W.2d at 88. It must be remembered, however, that in that

appeal we were not faced with any question concerning the sufficiency of the evidence, and thus our recitation of the evidentiary background was not given in response to any contention that the verdict lacked evidentiary support.

In sum, every circumstance pointed so directly at petitioner as the perpetrator of the rape that the use of the information contained in the F.B.I. report, to the extent that it was not incriminatory of petitioner, would not have affected the jury's verdict.

We have examined petitioner's remaining contentions and conclude that they are without merit.

The order denying post-conviction relief is affirmed.

All the Justices concur.