STATE of South Dakota, Plaintiff
and Appellee,

v.

Leonard L. BLUE THUNDER a/k/a
Leo Blue Thunder, Defendant
and Appellant.

Nos. 16920, 16929.

Supreme Court of South Dakota.

Argued Sept. 18, 1990.

Filed Feb. 20, 1991.

Rehearing Denied April 3, 1991.

Diane Best, Asst. Atty. Gen. (Roger A. Tellinghuisen, Atty. Gen., on brief), Pierre, for plaintiff and appellee.

Lee C. 'Kit' McCahren, Pierre, and Lee M. McCahren, Vermillion, for defendant and appellant.

MORGAN, Retired Justice.

Leonard L. Blue Thunder (Blue Thunder) appeals a judgment entered pursuant to a jury verdict convicting him of first-degree murder, first-degree burglary, and aggravated assault. Blue Thunder challenges the refusal of the trial court to excuse certain jurors for cause, to suppress certain evidence, and to instruct the jury on self-defense. By notice of review, the State of South Dakota challenges two jury instructions regarding the charge of aggravated assault. We affirm.

The facts that gave rise to this action are found in the triangle relationship involving Donna Leader Charge (Donna), her first lover Blue Thunder, and Verle Janis (Verle), her second lover and the victim of the murder. When Blue Thunder sought to regain the affections of Donna, Verle severely beat him, and Blue Thunder retaliated by going to the motel where Verle and Donna were residing and stabbing Verle with a butcher knife.

More particularly, the record reflects that on the night of June 2, 1989, Donna went to the West Wind Bar in Pierre. Blue Thunder was at the bar when Donna arrived. Later, when Verle arrived at the West Wind, the two men began to argue. The argument escalated into a fist fight, which took place outside of the bar. Donna was able to intervene and break up the fight. Donna and Verle then left and began walking back to their room at the Terrace Motel. When they arrived at the motel, Donna and Verle found Blue Thunder waiting for them. Again, the two men began to fight and again, Donna broke up the fight. Blue Thunder then fled.

Later, in the early morning hours of June 3, 1989, Blue Thunder returned to the motel armed with a butcher knife. Donna and Verle were about to retire for the night when Blue Thunder opened the unlocked door and charged at Verle with the knife. Verle was stabbed six times before he staggered to a nearby chair and collapsed. Blue Thunder then grabbed Donna by the arm and swung at her with the knife. In the ensuing struggle, Donna sustained a cut on her neck and on one of her hands.

In the meantime, the disturbance had awakened the manager of the motel and prompted him to call the police. At approximately 3:40 a.m., Officer David Trautman (Officer Trautman) of the Pierre Police Department arrived in response to the call. As he walked toward Verle's room he saw Blue Thunder standing in the doorway with blood on his chest and the knife in his hand. When Donna saw the officer, she yelled "He stabbed him!" Blue Thunder then tried to close the door but Officer Trautman kicked it open. The officer then knocked Blue Thunder to the floor, causing him to drop the knife, and handcuffed him.

Shortly after Blue Thunder was handcuffed, he was taken outside and was read his *Miranda* rights by Officer Michael Bucholz. In response, Blue Thunder replied "I'd like to take the fifth amendment." At the direction of Detective Lieutenant Greg Swanson, the officer in charge, Blue Thunder was then placed in the back of a patrol car under Officer Trautman's surveillance, where they remained for the next forty-five minutes and their conversation was recorded. The details of the conversations in the patrol car will be related in more detail in the discussion of the suppression issue. Suffice it to say for now, that after being placed in the patrol car, Blue Thunder asked to speak to his attorney, to which Officer Trautman responded "Leo I can't do that." While in the patrol car, Blue Thunder stated that he wanted to "take the Fifth Amendment" five separate times.

Officer Trautman advised him to "not say anything" four times, and warned Blue Thunder that anything he said could be used against him five different times. Interspersed between the several times that Blue Thunder invoked his Fifth Amendment rights, and the warnings by Officer Trautman, Blue Thunder made several incriminating statements.

When Blue Thunder was taken to the police station, his conversations were again recorded. At the police station, Blue Thunder again asked for his attorney two separate times. Blue Thunder also asked for phone access (to call his mother and/or a clergyman) nine times at the police station; these requests were all denied. Again, Blue Thunder made several incriminating statements. Also at the police station, at 5:50 a.m., a blood sample was taken from defendant. The results indicated a BAC in excess of 0.24 at that late hour. After the taking of the blood sample, Blue Thunder was allowed to call his attorney.

Blue Thunder was subsequently indicted by a grand jury on charges of first-degree murder, first-degree burglary, and aggravated assault. At a pretrial suppression hearing, the trial court ruled that the bulk of Blue Thunder's statements on the morning of June 3, 1989, were voluntary and admissible at trial.[1] The recordings of the balance of the conversations in the patrol car and at the police station, along with transcripts of those conversations, were admitted into evidence at trial. Defense counsel also challenged at pretrial the admissibility of some photographs. At trial, the trial court admitted most of the pictures and excluded others.

The panel of prospective jurors included four persons whom the defense counsel challenged on the basis of bias or prejudice. The specific grounds will be detailed in the discussion of the issue. The trial court denied the motions to excuse the jurors and defense counsel had to exercise four of their twenty peremptory challenges to ex-

---

1. The trial court did exclude a statement regarding the location of Blue Thunder's shoes that was made in response to a direct question by Officer Trautman. Also excluded was a tape-recorded interrogation of Blue Thunder by Lieutenant Swanson conducted at the police department on the morning of the murder.

clude them. The trial court also denied defense counsel's motion for additional peremptories. The defense counsel used nineteen of their allotted twenty peremptory challenges.

In the course of settling instructions, defense counsel proposed an instruction on self-defense which the trial court denied. State also objected to two instructions involving the question of intent necessary for the aggravated assault charge and the defense of intoxication on that charge.

On November 3, 1989, a jury convicted Blue Thunder of all three charges. He was sentenced to life imprisonment without parole for the murder conviction, and two concurrent ten-year sentences for the first-degree burglary and aggravated assault convictions. This appeal followed.

On appeal Blue Thunder urges the following issues:

1. Did the trial court err by admitting statements that Blue Thunder made on June 3, 1989?

2. Did the trial court err by refusing to disallow for cause certain potential jurors?

3. Did the trial court err by refusing to instruct the jury on self-defense?

4. Did the trial court err by admitting certain photographs?

By notice of review State raised two issues, which we view as one, as follows:

5. Did the trial court err by instructing the jury that aggravated assault under SDCL 22–18–1.1(5) is a specific intent crime, and that, as such, voluntary intoxication is an available defense?

In his first issue, Blue Thunder argues that the inculpatory statements that he made on June 3, 1989, immediately after he was taken into custody, should not have been admitted into evidence at trial because they were obtained in violation of his Fifth Amendment right to an attorney, and as a result of police misconduct. State, on the other hand, argues that the statements that were admitted were voluntary statements, not made in response to interrogation, or, alternatively, that the statements

were made after waiver of Blue Thunder's previously exercised Fifth Amendment rights.

■ Our review of this issue is controlled by the following precedent. State has the burden of proving beyond a reasonable doubt that Blue Thunder's statements were given voluntarily. *State v. Volk*, 331 N.W.2d 67, 70 (S.D.1983). On review, the trial court's ruling will be upheld unless it is clearly erroneous. *Id.* at 70–71. In addition, we must consider the evidence in the light most favorable to the trial court's decision. *State v. Kiehn*, 86 S.D. 549, 556, 199 N.W.2d 594, 598 (1972).

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established that the accused has a Fifth and Fourteenth Amendment right to have counsel present during a custodial interrogation. "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981).

On the issue of voluntary waiver, this court has held:

The standard to be used by a court in determining whether or not an accused has effectively waived his right to counsel is found in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), wherein the United States Supreme Court stated:

It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an *intentional relinquishment or abandonment* of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that

case, including the background, experience, and conduct of the accused. (Emphasis added.) 304 U.S. at 464, 58 S.Ct. at 1023.

*State v. Arpan,* 277 N.W.2d 597, 599–600 (S.D.1979).

■ In determining whether incriminatory statements made to law enforcement officers have been validly obtained, a threshold determination is whether the statements were made in response to custodial interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Boykin,* 432 N.W.2d 60 (S.D.1988). Interrogation encompasses not only express questioning but also any practice "that the police should know [is] reasonably likely to elicit an incriminating response from a suspect.... [T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 301–02, 100 S.Ct. at 1690, 64 L.Ed.2d at 308 (emphasis in original; footnotes omitted); *quoted in Boykin,* 432 N.W.2d at 64.

■ As earlier noted, Blue Thunder was read his *Miranda* rights by Officer Bucholz and responded: "I'd like to take the Fifth Amendment," whereupon he was placed in the back of a patrol car under the surveillance of Officer Trautman. The trial court made the following findings of fact:

Officer Trautman remained in the patrol car with Defendant and turned on a tape recorder. Defendant made several oral admissions while sitting in the car. During the course of these admissions, Trautman advised Defendant several times that anything he said could be used against him in court and advised him not to talk about the incident.

While in the patrol car, Defendant asked to speak to Detective Swanson. At that point, Swanson stuck his head in the car window at the scene and Defendant made several statements.

From these findings the trial court concluded as a matter of law:

[T]he Defendant's oral admissions made to Officer Dave Trautman and Detective Swanson while sitting in the patrol car at the scene, were made at the Defendant's behest. Although it is custodial, none of it involved interrogation. Therefore, the Defendant's statements made at that time shall not be suppressed.

The first part of the record of the conversation that followed can best be described as the jabberings of an inebriate, interspersed with statements and responses from Officer Trautman. Blue Thunder expressed an interest in finding out if the victim was dead, whereupon Officer Trautman warned him that anything he said could be used against him. Blue Thunder responded: "I'll just take the Fifth Amendment too." He also said: "I'm entitled to a couple a phone calls too." "I want to call home." Officer Trautman responded that would be taken care of at the jail, as there was no phone in the car. After again "taking" the Fifth Amendment and without any interrogation by Officer Trautman the following colloquy occurred:

Blue Thunder: I'll give a confession right now, of my own free will. Officer?

Officer Trautman: What's that?

Blue Thunder: I'll give a confession right now. Will you do it?

Officer Trautman: If you want to talk.

Blue Thunder: Of my own free will.

Officer Trautman: Leo, let me explain something to you.

Blue Thunder: I'll take the Fifth Amendment too.

Officer Trautman: Okay, let me explain something. If you want to talk to anyone about what happened tonight, what I'll have to do is get ahold of Lt. Swanson.

Blue Thunder: I'll have to talk to my attorney too,—(inaudible)—legal too.

The above statement was the first mention by Blue Thunder that he specifically desired to exercise his Fifth Amendment right to speak to an attorney. After again warning Blue Thunder and suggesting that he not say anything, *Officer Trautman again asked Blue Thunder if he wanted*

*to talk to Lieutenant Swanson* and Blue Thunder indicated yes.

Lieutenant Swanson then came over to the car. He identified himself as a member of the police department and again advised Blue Thunder of his right to remain silent and of his right to an attorney. Blue Thunder's response was: "I know that, I know my Miranda rights, yeah I know that. I'll speak of my own free will." Blue Thunder inquired as to what he was charged with and the response was "suspicion of murder." He then made statements: "I'll take the rap." "It was intentional." "Donna's my wife and that guys' been fucking around with my woman." Blue Thunder then said: "After this I'll take the fifth amendment," and the Lieutenant then tried to terminate the interrogation. Blue Thunder, however, went on to volunteer that Donna had helped him, with her hand on the knife. When asked by Lieutenant Swanson if he had been drinking, Blue Thunder admitted that he had, "to the max." After Swanson exited the patrol car, Blue Thunder, in the presence of Officer Trautman, again stated twice "I killed him."

It is noteworthy that the trial court's findings of fact and conclusions of law totally ignored the fact that Blue Thunder had specifically sought to exercise his right to counsel and the legal implications of that fact. The fact that there was not a telephone available in the patrol car is no excuse. All the officers had to do was proceed to the station where a telephone was available. Even when they did go to the station, as they did shortly after Lieutenant Swanson had obtained the highly inculpatory statements, Blue Thunder was not permitted access to the telephone for several hours, during which time he was further interrogated by Lieutenant Swanson, which interrogation was suppressed by the trial court.

The record reflects no reason for holding Blue Thunder incommunicado at the scene, other than to permit him to babble into the tape recorder. The burden was upon the State to show that Blue Thunder, in his highly inebriated condition, made an intelligent and voluntary waiver of his constitutional right to counsel. We think that the State has wholly failed in that regard. The continuing incarceration in the patrol car, in tight restraints which he complained of constantly, not only negate an intelligent, voluntary waiver, but borders on an invidious form of compulsion. Blue Thunder's intermittent invocations of his Fifth Amendment rights throughout the conversations eschews any intentional waiver of his right to counsel. The police officers knew that they had a drunken suspect in custody and purposely held him incommunicado in the police car for at least forty-five minutes to "milk" the situation for any incriminating statements they could get. We recognize that it is the task of law enforcement officials to gather evidence to lead to convictions, but it is the task of the judiciary to ensure that the fundamental and constitutional rights of the accused are not trampled on in that process. In this case Blue Thunder's rights were indeed trampled and the trial court failed to even note the key issue. The statements of Blue Thunder in the patrol car and in the police station should have been suppressed in their entirety.

■■■ Having arrived at that conclusion, we are left with the question whether the error was so egregious as to have denied Blue Thunder a fair trial. Although the police tactics approached dangerously close to coercion,[2] we conclude that even if Blue Thunder's statements were obtained in violation of his *Miranda* rights and should have been excluded, this error was not so prejudicial as to require reversal. Prejudicial error, when constitutional questions

---

**2.** "[T]hree decisions of the United States Supreme Court [*Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290, 303–04 (1978); *Jackson v. Denno,* 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 915 (1964); *Payne v. Arkansas,* 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975, 981 (1958)] 'have actu-

ally held that the admission of coerced confessions cannot be considered harmless error.'" *State v. Fulminante,* 161 Ariz. 237, 262, 778 P.2d 602, 627 (1988) (citation omitted) *cert. granted,* — U.S. —, 110 S.Ct. 1522, 108 L.Ed.2d 762, and *cert. denied,* — U.S. —, 110 S.Ct. 1528, 108 L.Ed.2d 768 (1990).

are being considered, is error which would have some likelihood of changing the result. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The denial of a constitutional right does not demand automatic reversal if an appellate court is able to declare beyond a reasonable doubt that the jury would have returned a verdict of guilty. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *State v. Miller,* 429 N.W.2d 26, 36 (S.D.1988); *State v. Garritsen,* 421 N.W.2d 499 (S.D.1988); *High Elk v. State,* 344 N.W.2d 497 (S.D.1984). Further, the United States Supreme Court has determined that the erroneous admission of a confession may be subject to a harmless error analysis. *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972).

■ Based upon the other evidence presented at trial, it is clear, beyond a reasonable doubt, that Blue Thunder would have been convicted of first-degree murder, aggravated assault, and first-degree burglary, notwithstanding the allegedly improper statements to law enforcement officers. Donna testified that she witnessed Blue Thunder charge into room 22 with a butcher knife and repeatedly stab Verle. When Officer Trautman arrived, Blue Thunder was standing in room 22, holding the butcher knife in his hand. Overwhelming testimony and physical evidence was presented at trial to support Blue Thunder's conviction without reference to the statements he made following the murder.

In addition, Blue Thunder's statements only inculpated him on the murder charge. His statements did not bear upon his culpability for burglary or aggravated assault. Based upon the testimony of State's witnesses, as well as the physical evidence presented, Blue Thunder would undoubtedly have been convicted on all three charges, notwithstanding the allegedly improper admission of Blue Thunder's incriminatory statements. Accordingly, any error in admitting Blue Thunder's statements was harmless, and does not warrant a reversal.

The second issue raised by Blue Thunder assigns as error the trial court's ruling on juror challenges. At the outset, it is conceded that it would be most unusual to find a jury panel more loaded with potential law enforcement bias than this one, which included the wife of the attorney general, the wife of the governor's counsel (himself a former assistant attorney general), a long-time law enforcement personality, and the mother of one of State's witnesses (a police officer). Then, out of the panel of thirty (or so), to have all four of these potential jurors drawn to sit, would seem ill-fated. That was the case, though, and each was interrogated during voir dire. Each testified that he or she could be a fair and impartial juror in spite of their respective situations.

■ Nevertheless, before this court can review an assignment of error for failure to disallow a potential juror for cause, the general rule requires that the defendant must exhaust all peremptory challenges. *State v. Bittner,* 359 N.W.2d 121, 127 (S.D. 1984); *State v. Belt,* 79 S.D. 324, 111 N.W.2d 588 (1961); *State v. Flack,* 77 S.D. 176, 89 N.W.2d 30, 32 (1958); *State v. Hammond,* 14 S.D. 545, 550, 86 N.W. 627, 628 (1901). During voir dire, Blue Thunder challenged for cause potential jurors Carol Tellinghuisen, Anne Gormley, Rol Kebach, and Mrs. Marvin Schweigert. The trial court denied each challenge and the jurors were subsequently removed by Blue Thunder's exercise of four peremptory challenges. Blue Thunder requested additional peremptory challenges to compensate for the fact that he was required to remove these jurors by expending four of his peremptory challenges. This request was also denied.

■ In this case, Blue Thunder does not claim that any individual juror actually empaneled, or that the entire jury panel, was not impartial. Blue Thunder used nineteen of his twenty peremptory challenges, and contends that he reserved a final challenge to prevent "a worse configuration" in the jury panel. He contends that this is substantial compliance with the requirement that all peremptory challenges be exhaust-

ed, and that, under the present circumstances, use of all but one peremptory challenge is sufficient to permit review. For support, he cites us to *People v. Bailey,* 169 Mich.App. 492, 495–496, 426 N.W.2d 755, 757 (1988), for that proposition. *Bailey,* however, deals with the effect of jury challenges on a decision for change of venue. Rather facetiously, Blue Thunder argues that he "was forced to waive the last peremptory challenge as it appeared that perhaps the Chief of Police for the City of Pierre or one of the victim's close family members would be permitted by the trial judge to serve on the jury if they were able to utter the words, 'I can be fair and impartial.'" The record does not, however, support Blue Thunder's argument. The jury pool called to be examined did not contain the names of any such person. While the logic of reserving one peremptory challenge to prevent the seating of such persons is persuasive from the standpoint of the litigator, the record here provides no support for Blue Thunder's failure to exercise all of his peremptory challenges.

Blue Thunder has failed to demonstrate any actual prejudice as a result of the refusal of the trial court to disallow for cause these potential jurors. *Mikus v. United States,* 433 F.2d 719 (2d Cir.1970); *Walter v. United States,* 386 F.Supp. 309 (D.C.Okla.1974). None of the jurors Blue Thunder complains of sat on the panel that tried him, as they were each removed by his exercise of peremptory challenges. He has not alleged that he was forced to accept the empaneling of any individual juror whom he would have otherwise removed by exercise of his peremptory challenges. Reversible error exists only where defendant can demonstrate material prejudice. *Woolston v. State,* 453 N.E.2d 965, 968 (Ind. 1983). On the basis of this record, we decline the invitation to overturn a ninety-year-old rule and, on that basis alone, we affirm the trial court.

We note, however, that when faced with challenges for actual bias, such as those presented here, it would have been better for the trial court to have allowed the challenges to the potential jurors. *State v. Church,* 6 S.D. 89, 60 N.W. 143, *rev'd on other grounds,* 7 S.D. 259, 64 N.W. 152 (1894). As a policy matter, when challenges of venirepersons for actual bias arise, trial courts would be wise to err on the side of disqualification; the worst that could happen would be that one impartial juror would be replaced with another. *State v. Culhane,* 33 N.Y.2d 90, 108, n. 3, 350 N.Y.S.2d 381, 398, n. 3, 305 N.E.2d 469, 481, n. 3 (1973).

■ We next examine Blue Thunder's claim that the trial court erred in refusing his proposed jury instruction on self-defense. *See* SDCL 22–16–35; 22–18–4. "A defendant is entitled to an instruction on his theory of defense if there is evidence to support it and a proper request is made. Conversely, he is not entitled to an instruction if there is no evidence to support his theory." *State v. Esslinger,* 357 N.W.2d 525, 532 (S.D.1984) (citations omitted); *see State v. Weatherford,* 416 N.W.2d 47 (S.D.1987); *State v. Kills Small,* 269 N.W.2d 771 (S.D.1978); *State v. Zemina,* 87 S.D. 291, 206 N.W.2d 819 (1973). The defense of self-defense is available only to prevent imminent danger of great personal injury, SDCL 22–16–35, or to prevent an offense against one's self or property, SDCL 22–18–4. "Unless the individual situation required an immediate response necessary to prevent unlawful force from being inflicted upon [defendant] or another, the statute [SDCL 22–18–4] is not applicable." *State v. Rich,* 417 N.W.2d 868, 871 (S.D.1988).

■ Here, the only evidence that Blue Thunder points to as supporting his claim of self-defense is that he and Verle had engaged in two separate fights on the evening before the murder, that Blue Thunder was allegedly invited into room 22 by Verle, and that another resident at the Terrace Motel testified that he heard a fight going on in room 22. Blue Thunder failed to establish any threat of immediate danger to himself. The fact that he and Verle had two fist fights the evening before is insufficient to support an instruction on self-defense.

Furthermore, after the second fight, Blue Thunder fled. He returned in the early morning hours, armed with a butcher knife, charged into the room, and stabbed Verle six times. Blue Thunder was clearly the aggressor and, as such, he is not entitled to assert self-defense. *State v. Woods*, 374 N.W.2d 92, 97 (S.D.1985), *cert. denied*, —— U.S. ——, 110 S.Ct. 1952, 109 L.Ed.2d 314 (1990); *see Rich*, 417 N.W.2d at 871; *State v. Means*, 276 N.W.2d 699, 701–02 (S.D.1979). Blue Thunder's own conduct in breaking in and stabbing an unarmed victim may not be relied upon to invoke the legal excuse of self-defense. *Rich, supra; Means, supra.* We affirm the trial court's denial of defendant's proposed instruction on self-defense.

 Finally, we examine Blue Thunder's argument that certain photographs admitted into evidence at trial should have been excluded because they were cumulative and prejudicial. Photographs are generally admissible when they accurately portray anything that a witness could describe or when they provide an aid to a verbal description of relevant objects or conditions. *State v. Muetze*, 368 N.W.2d 575, 586 (S.D.1985); *State v. Rash*, 294 N.W.2d 416, 418–19 (S.D.1980); *State v. Compton*, 48 S.D. 430, 433, 205 N.W. 31, 32 (1925).

 The photographs at issue were taken on the morning of the incident. They depicted the murder victim and the scene of the murder, burglary, and assault. None of these pictures was particularly graphic in nature. The trial court considered Blue Thunder's objections, excluded some photographs and admitted the remaining pictures. The trial court has discretion whether to admit duly verified photographs of a murder victim. *State v. Aschmeller*, 87 S.D. 367, 372, 209 N.W.2d 369, 372 (1973). In reviewing the photographs admitted at trial of the murder victim, of the assault victim, and of the crime scene, it is apparent that the trial court did not abuse its discretion in admitting these pictures, and we affirm on this issue.

Because we affirm the convictions of Blue Thunder on all of the issues raised by him on appeal, it is unnecessary for us to examine the issues raised by State in its notice of review.

The decision of the trial court is affirmed in all respects.

MILLER, C.J., concurs.

WUEST, J., concurs specially.

HENDERSON and SABERS, JJ., dissent.

HERTZ, Circuit Judge, acting as a Supreme Court Justice, not having been a member of the court at the time this case was argued, did not participate.

WUEST, Justice (concurs specially).

I concur in this opinion except for the fact finding of the majority on the voluntary statements made by the defendant. We should leave the fact finding to the trial court and reverse only when the facts found are clearly erroneous. *State v. Jenner*, 451 N.W.2d 710 (S.D.1990). There are no facts to suggest the police held the defendant to obtain admissions in violation of his *Miranda* rights. Rather, the facts show the defendant was repeatedly warned against making incriminating statements, yet he continued to make voluntary statements incriminating himself. It was unnecessary for the police to gag him or rush him to the police station at the start of a murder investigation to prevent him from making voluntary incriminating statements.

HENDERSON, Justice (dissenting).

In reviewing this case, it appears to me that Blue Thunder did not receive a fair trial. Therefore, I would reverse and remand for a new trial.

Although Blue Thunder asked for an attorney, the law enforcement officials absolutely denied him that right. Nine times he asked to contact his attorney and nine times it was denied. Clearly, this is prejudicial error. *State v. Michalek*, 407 N.W.2d 815 (S.D.1987). In point of fact, it was approximately three hours before his lawyer was called, after the focus of the investigation was upon him, and he was in

custody (handcuffed in patrol car). Certainly, containing him in this patrol car, while he was drunk, while he was asking for a lawyer, and while he was pleading the Fifth Amendment, was the functional equivalent of interrogation. In my opinion, the court's finding on this matter was clearly erroneous. *State v. Hall*, 353 N.W.2d 37 (S.D.1984). In this case, the State's Attorney excused two Indian prospective jurors by peremptory challenge. Blue Thunder is an American Indian. I do not assign this as reversible error per se, but recite it to reflect the flavor of the fairness of this trial.

Further, for 45 minutes he was held by law enforcement officers, in a police car, with a tape recorder on, while he was handcuffed. Five separate times, while he was in the police car, he exercised his right to remain silent by taking the Fifth Amendment. While he was in this police car, and when he asked to talk to his lawyer, the officer told him "Leo, I can't do that." Yet, they persisted in extensive questioning. This was contrary to the holding in *Edwards v. Arizona*, 451 U.S. 477, 484, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981). This was a violation of his right to remain silent. Considering this, and the fact that his blood test reflected a .30 percent blood alcohol level, he was simply dead drunk. The statements which he made, under the totality of these circumstances, were not voluntary, in that the statements were not knowingly, intelligently, and voluntarily made. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Apparently, having totally decried the violation of Blue Thunder's constitutional rights, the majority opinion takes the position that the error was not "so egregious as to have denied Blue Thunder a fair trial." I cannot accept this leap of logic and that is where I part company with the majority opinion. Having made that leap of logic, to which I disagree, the majority opinion then rests its opinion on the harmless error rule, i.e., Blue Thunder would have been convicted of First Degree Murder due to the conclusion that, absent these admissions we, as an appellate court, can

declare, beyond a reasonable doubt, that the jury would have returned a verdict of guilty. In my opinion, the testimony did not attain, absent these constitutional violations, such a degree of proof. As we have acknowledged before, "the harmless error rule ought never be used to justify unfairness at trial." *State v. Webb*, 251 N.W.2d 687 (S.D.1977).

"Egregious" is not the standard. Recently, the United States Supreme Court agreed to review a state court's determination that constitutional law prohibits a consideration of the harmless error rule when the issue involves a confession in violation of the Fifth Amendment. *State v. Fulminante*, 161 Ariz. 237, 778 P.2d 602, 627 (1988), (citation omitted) *cert. granted*, —— U.S. ——, 110 S.Ct. 1522, 108 L.Ed.2d 762, and *cert. denied*, —— U.S. ——, 110 S.Ct. 1528, 108 L.Ed.2d 768 (1990).

The majority opinion again condemns the jury panel as being "loaded" with potential law enforcement bias against this defendant. I agree. I do not believe that it was fair to place these people on this panel, thereby absolutely necessitating the removal of these prospective jurors from trying the case. I am astounded, bluntly, that these prospective jurors were not excused for cause at the outset. Unfortunately, they were not and Blue Thunder was required to exercise four peremptory challenges including, mind you, the wife of the Attorney General of this state. Rol Kebach was in criminal law enforcement in this state for approximately 30 years in the Department of Criminal Investigation, which has its headquarters in Pierre where this case was tried. The Department of Criminal Investigation building is named in his honor. I find it almost unbelievable that Mrs. Schweigert was not excused for cause when she related that her son was a member of the Pierre Police Department and was expected to testify at trial. In point of fact, he did testify at trial for the State. Kebach, it should be noted, was involved in the selection process to hire witness Ily Zeldes. Defense counsel repeatedly attempted to have Kebach exempted for cause but it was all denied.

Kebach, it should further be noted, spoke at Criminal Investigation Agent Gromer's retirement party. Also, the Attorney General's wife was called as a potential juror. I note that Mrs. Tellinghuisen testified that she and her husband visited about cases that he was working on; the Attorney General and his wife lived in Pierre, the situs of these alleged crimes was the City of Pierre. She advised the court that if she was charged with murder she would not want 12 jurors married to the Attorney General sitting on her case. Notwithstanding all of these comments, repeated motions to have her excused from the jury were denied. Grant Gormley was formerly the chief prosecutor for the Attorney General's office. State's Attorney Moreno, who was prosecuting this case, knew the Gormleys very well and visited with them socially. Recently, Mrs. Gormley had gone to the prosecutor's home and delivered a gift in honor of a new child born unto Mr. and Mrs. Moreno. The trial judge refused a challenge to have Mrs. Gormley removed for implied bias.

As a result of this refusal, defense counsel had to remove these prospective jurors by peremptory challenge. Defense counsel moved his Honor's judgment for additional peremptory challenges but this was denied. As was stated in *State v. Meyers,* 190 Neb. 466, 209 N.W.2d 345, 348 (1973):

> It is the duty of a trial court to see that Defendants in criminal cases are tried by a jury such that not even the suspicion of bias (leaning) or prejudice (prejudgment) can attach to any member thereof. Unless the jury be absolutely impartial, the jury system becomes an awkward instrument of justice and the Constitutional guaranty that every person charged with an offense against the laws of this state ... shall have a public and speedy trial by an impartial jury ... is worthless.

It is understandable why defense counsel did not choose to exercise his last peremptory challenge. Having been stricken with unfavorable rulings and what appears to be legitimate requests for striking a juror for cause, defense counsel was afraid to roll the dice on his last peremptory challenge, believing that Blue Thunder might end up

with another juror who, once again, could preclude him from having a fair trial. Thus, he did not exercise the last peremptory challenge. Under this factual scenario, it was a valid trial technique. I would carve out an exception to the *State v. Connor,* 86 S.D. 578, 199 N.W.2d 695 (1972) and its successor *State v. Bittner,* 359 N.W.2d 121, 127 (S.D.1984) that the defendant was not required to exercise his final peremptory challenge because he had been forced to exercise four peremptory challenges due to the trial court's patently incorrect rulings. Simply put, it goes to the fairness of this particular jury trial.

It is fundamental we, at the appellate level, insure the integrity of the jury system. I refuse to be bound by a technical formula which strips the spirit of fairness from a jury trial. As the jury panel was "loaded" against Blue Thunder (per the majority opinion's characterization), it cast a pall of unfairness on all of the proceedings below at trial. I would grant a retrial so that this pretense of a fairly selected jury panel would be obliterated, thus casting aside the appearance of bias and impropriety in the judicial branch of the State of South Dakota.

SABERS, Justice (dissenting).

I dissent on Issue I.

Issue I. I would reverse and remand for a fair trial in view of Blue Thunder's prompt claim of Fifth Amendment rights and his prompt request for an attorney, specifically attorney Kit McCahren. The fact that the officers gave Blue Thunder his *Miranda* rights while the tape was running indicates to me that they knew he would continue to jabber while he cooled his heels in the police car for forty-five minutes. Although this was not an in-custody interrogation in the usual sense, once the police knew the accused was claiming his Fifth and Sixth Amendment rights, it was not proper to put him in cold storage and tape his intoxicated mutterings. I strongly believe that the trial court should have excluded such "admissions and state-

ments" under these circumstances and I would reverse for a new trial.

Issue II. I am troubled about the failure to disqualify as jurors Carol Tellinghuisen, Rol Kebach, Ann Gormley and the mother of the state's witness. Upon remand for a new trial, individuals so closely connected to law enforcement should be excused for cause.